UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| PATRICK A. DOWLING, M.D., )<br>　)<br>　　Plaintiff, )<br>　)<br>v. )<br>　)<br>MEDICAL MUTUAL INSURANCE )<br>COMPANY OF MAINE, INC. )<br>　)<br>　　Defendant. ) | Civil Action No. CV-06- |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.  Plaintiff Patrick A. Dowling, M.D., brings this action against Defendant Medical Mutual Insurance Company of Maine, Inc., ("Defendant" or "MMIC") for (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq.*, and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §4551, *et seq.*; (2) failure to provide a reasonable accommodation in violation of the ADA and the MHRA; (3) unlawful retaliation in violation of the ADA and the MHRA; (4) breach of contract; (5) intentional infliction of emotional distress; and (6) negligent infliction of emotional distress.  Plaintiff seeks damages, including compensatory and punitive damages; equitable relief, including back pay and front pay; costs and attorney's fees; and all other relief available under the ADA, the MHRA, and the Civil Rights Act of 1991.

**JURISDICTION AND VENUE**

2.  Jurisdiction in this Court is proper pursuant to 42 U.S.C. §12117 and 28 U.S.C. §§1331 and 1343.  Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Plaintiff's claims arising under state law.

3. Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b) as the district in which Defendant resides and in which a substantial part of the events giving rise to Plaintiff's claims occurred.

## JURY DEMAND

4. Plaintiff demands trial by jury of all claims and issues to the extent permitted by law.

## PARTIES

5. Plaintiff is an individual who at all relevant times resided in Cumberland County, Maine. Plaintiff was an employee of MMIC until the termination of his employment as of October 21, 2005.

6. MMIC is a Maine insurance company incorporated under the laws of the State of Maine with a principal place of business in Portland, Maine. At all relevant times, MMIC employed in excess of 50 individuals. MMIC is and was at all relevant times an employer and an entity covered by the ADA and the MHRA.

## ADMINISTRATIVE PROCEDURES

7. Plaintiff filed a charge of discrimination, alleging disability discrimination and retaliation, against MMIC with the Maine Human Rights Commission on or around October 27, 2005, and with the Equal Employment Opportunity Commission on or around October 31, 2005.

8. On May 15, 2006, the Maine Human Rights Commission issued a Notice of Right to Sue to Plaintiff because more than 180 days had passed since Plaintiff filed his charge with the Maine Human Rights Commission.

9. On May 16, 2006, the Equal Employment Opportunity Commission issued a Notice of Right to Sue to Plaintiff because more than 180 days had passed since Plaintiff filed his charge with the Equal Employment Opportunity Commission.

10. Plaintiff has satisfied all administrative prerequisites to filing this Complaint.

## FACTS COMMON TO ALL COUNTS

11. Plaintiff was a co-founder of MMIC in 1977 and served as Chairman of the Board of Directors for MMIC from its inception up to the time that Plaintiff became employed by MMIC as its Chief Executive Officer ("CEO") and President. Plaintiff continued to serve on the Board of MMIC after he became MMIC's CEO and President.

12. Plaintiff became employed by MMIC as its CEO and President in October 2002.

13. In connection with his employment by MMIC as its CEO and President, Plaintiff entered into an "Employment Agreement" with MMIC dated July 15, 2002.

14. Pursuant to the terms of the Employment Agreement, MMIC agreed to employ Plaintiff for a three-year period, from October 1, 2002, to October 1, 2005, and thereafter for an additional period through MMIC's annual meeting in 2009.

15. The Employment Agreement provided that MMIC was entitled to terminate Plaintiff's employment without severance pay only for limited, enumerated reasons, including (a) Plaintiff's "death," (b) Plaintiff becoming "totally disabled" for a period of six months, and (c) "cause" as defined in the Employment Agreement.

16. The Employment Agreement provided that (a) if MMIC terminated Plaintiff's employment "without cause," or (b) if Plaintiff terminated his employment for "Good Reason" as defined in the Employment Agreement, Plaintiff would be entitled to received severance benefits as follows: (i) during the third year of employment, continuation of Plaintiff's monthly base salary for a period of 24 months, (ii) during the fourth year of employment, continuation of Plaintiff's monthly base salary for a period of 12 months, and (iii) during the fifth and sixth years of employment, continuation of Plaintiff's monthly base salary for a period of six months.

17. In addition, the Employment Agreement provided that if MMIC terminated Plaintiff's employment "without cause," Plaintiff would be entitled to "a lump sum payment of an

amount equal to the monthly cost of MMIC's then current medical insurance premium during the period between such termination and the date when [Plaintiff] becomes entitled to participate in the medicare coverage."

18.   As CEO and President of MMIC, Plaintiff's job duties included overseeing the operations and overall management of the company.

19.   At all relevant times, Plaintiff had the skills, experience, education, and other job-related requirements necessary to perform the responsibilities and essential functions of the job of CEO and President of MMIC.  At all relevant times, Plaintiff performed his job duties as CEO and President of MMIC in a satisfactory manner.

20.   In early April 2005, Plaintiff suffered a right middle cerebral artery embolic stroke, which initially resulted in a left-hemiparesis, left-homonymous hemianopsia, and left neglect.  Since the date of Plaintiff's stroke, he has been involved in physical and speech rehabilitation and his condition has steadily improved.

21.   At all relevant times after his stroke in April 2005, Plaintiff was a qualified individual with a disability as defined by the ADA and the MHRA.  At all relevant times, Plaintiff had a physical impairment that substantially limited certain of his major life activities, including, but not limited to, walking and using his left arm.  In addition, at all relevant times, Plaintiff had a record of a disability, and MMIC regarded Plaintiff as having a disability.

22.   At all relevant times after his stroke in April 2005, Plaintiff was able to perform the essential functions of the position of CEO and President of MMIC, with or without a reasonable accommodation.

23.   In July 2005, Plaintiff began discussions with MMIC concerning his plans to return to work as CEO and President.  MMIC, acting through members of its Board of Directors and its

agents, while ostensibly encouraging Plaintiff to return to work and offering to assist Plaintiff to return to work, repeatedly resisted Plaintiff's efforts to return to work.

24. Further, during the period of time that Plaintiff was making efforts to return to work as CEO and President of MMIC, MMIC acting through certain members of its Board of Directors and its agents, engaged in a deliberate and intentional campaign to thwart Plaintiff's efforts because MMIC wrongfully believed that Plaintiff could not perform his job based on his disability. MMIC, acting through certain members of its Board of Directors and its agents, misreported information to the remaining members of MMIC's Board of Directors, misrepresented Plaintiff's status to MMIC's remaining members of MMIC's Board of Directors, and took steps to sabotage Plaintiff's efforts to return to work.

25. As an example of MMIC's efforts to thwart Plaintiff's efforts to return to work, MMIC altered Plaintiff's job description—after he had suffered a stroke—in an effort to make it appear that Plaintiff would not be able to perform the essential functions of his job as CEO and President.

26. In addition, MMIC, acting through certain members of its Board of Directors and its agents, urged Plaintiff to apply for long-term disability benefits, informing Plaintiff that he would be assisting MMIC because any benefits he received would save MMIC money by reducing its obligation to pay salary under Plaintiff's employment agreement. MMIC's agents misrepresented to members of MMIC's Board of Directors that taking long-term benefits was in Plaintiff's best interests, and that by taking long term disability benefits Plaintiff would not need to return to work and MMIC could avoid returning Plaintiff to his position as CEO and President.

27. In addition, MMIC, acting through members of its Board of Directors and its agents, insisted that Plaintiff turn over all of his confidential medical records relating to his stroke.

28.     The confidential medical records requested by MMIC were not necessary to establish that Plaintiff had a disability or to support any reasonable accommodations that Plaintiff may have needed to perform the essential functions of his job as CEO and President.  Plaintiff explained to MMIC that the requested medical records were prepared for purposes of his personal rehabilitation and not for his return to work.

29.     In response to MMIC's demands that Plaintiff turn over his confidential medical records, Plaintiff offered to provide a medical report from his physician regarding his ability to return to work as CEO and President of MMIC.  MMIC refused to accept or consider a report from Plaintiff's physician.

30.     Instead of accepting a report from Plaintiff's physician as it was required to do under the ADA and the MHRA, MMIC, acting through members of its Board of Directors and its agents, demanded that (a) Plaintiff submit to an independent medical examination, performed by a doctor of its own choice, and (b) Plaintiff travel to New York or Boston to obtain the examination.  MMIC's demand that Plaintiff travel to New York or Boston for a medical examination was demeaning and unnecessary, and it would have been conspicuously cumbersome for Plaintiff to comply with the demand at the time.

31.     MMIC's refusal to accept a report from Plaintiff's own physician, and MMIC's demands to Plaintiff to provide his entire confidential medical records and undergo an independent medical examination by the doctor of its own choice, constituted separate violations of the ADA and the MHRA.

32.     In an effort to comply with MMIC's unreasonable (and unlawful) demands to undergo a company-sponsored medical evaluation, Plaintiff agreed to be evaluated by Helen Barnes, Ph.D., an organizational psychologist who frequently performed work as an agent and

6

representative of MMIC. Before Dr. Barnes conducted the evaluation, MMIC's agents arranged to meet with Dr. Barnes to discuss the evaluation.

33. The report submitted by Dr. Barnes, dated August 22, 2005, was biased, facially inconsistent, and medically unsupported. Dr. Barnes concluded that Plaintiff could not return to work, apparently based on certain personality changes that she allegedly (and incorrectly) perceived in Plaintiff after Plaintiff's stroke. Significantly, by her own admission, Dr. Barnes intentionally and specifically did *not* consider whether there were any reasonable accommodations that Plaintiff could have used to assist him in performing the essential functions of his job as CEO and President of MMIC.

34. In light of Dr. Barnes' patently deficient report, Plaintiff again offered to provide a report from his own treating physician regarding his ability to return to work, as well as a report from an independent neuropsychologist not involved or associated with MMIC.

35. MMIC yet again improperly rejected Plaintiff's offer to provide a report from his own treating physician, as well as a report from an independent neuropsychologist, stating that any such report was not acceptable because, MMIC asserted, reports produced by Plaintiff would be biased and unreliable.

36. After additional requests from Dr. Dowling, MMIC ostensibly and reluctantly agreed to consider reports from Plaintiff's own physician and an independent medical examiner regarding Plaintiff's ability to return to work as CEO and President of MMIC. On information and belief, MMIC ostensibly agreed to consider reports from Plaintiff's own physician and an independent medical examiner only after MMIC was informed of its legal obligations and the applicable law by its attorneys.

37. On September 16, 2005, Plaintiff underwent a thorough independent neuropsychological review by Melvyn Attfield, Ph.D., 'C.Psychol, ABPN, FACPN. Dr. Attfield

determined that Plaintiff was fully able to return to his job as CEO and President of MMIC with minor reasonable accommodations. Dr. Attfield also determined that the report from Dr. Barnes was not reliable and unsupportable. Dr. Attfield's report, dated September 19, 2005, concluded as follows:

> Based on cumulative objective information from the Maine Center for Integrated Rehabilitation, Dr. Dowling has progressed in the rehabilitation of selected deficit areas to the extent that from a cognitive perspective, there is no objective domain specific deficit that would prevent him, cognitively from completing his job.
>
> - Mr. McOsker [Plaintiff's speech pathologist] has objective information to suggest areas of improvement to place Dr. Dowling within a functional range in the essential areas of his occupation. Reading and analytical abilities are intact. There is no deficit in intellectual capacity, memory or higher cognitive functioning. Abstract reasoning and executive capacity are intact.
>
> - Dr. Barnes' report is methodologically flawed. There is no objective data provided. The predictive validity of testing is unknown. It would be appropriate to determine whether Dr. Barnes is qualified to provide an opinion regarding the rehabilitation potential of a gentleman with Dr. Dowling's diagnosis, demographic and neuropsychological predictors.
>
> - It is my understanding that Dr. Barnes has not reviewed any progress notes from Maine Center for Integrated Rehabilitation.
>
> - Dr. Barnes' report does not appear to discriminate between physical and cognitive abilities. She does not appear to have empiric basis for her opinion regarding Dr. Dowling's work capacity.
>
> - It would be appropriate to allow Dr. Dowling a brief period of transition, with collegial interaction for mentoring. It would appear appropriate for the CFO and administrative assistant to help in this transition phase.

38. In addition, Plaintiff's treating physician, Heinrich Grube, M.D., provided a report regarding Plaintiff's ability to return to work. Dr. Grube's report, dated September 9, 2005, concluded as follows: "Based on his improvement over the last months it is my opinion that Dr. Dowling should be able to return to work in his previous position. He will need reasonable accommodations such as a driver and ergonomic adjustments at his work place, for example a voice

activated computer program. He should have input from occupational therapy to maximize the support that is technically available."

39.     Plaintiff provided Dr. Grube's report to MMIC on September 20, 2005. Plaintiff provided Dr. Attfield's report to MMIC on September 22, 2005.

40.     On September 28, 2005, Plaintiff notified MMIC that he was ready and able to return to work as CEO and President on Monday, October 3, 2005.

41.     Despite Plaintiff's announcement that he was ready and able to return to work and Plaintiff's reports indicating that he was able to return to work as planned, MMIC informed Plaintiff, prior to October 1, 2005, that it would not permit him to return to work.

42.     Soon after Plaintiff suffered the stroke, MMIC's Board of Directors formed a "Senior Management Search Committee" for the specific purpose of seeking a replacement for Plaintiff. The Senior Management Search Committee was formed and instructed to find a replacement before MMIC ever evaluated whether Plaintiff was able to return to work with or without a reasonable accommodation. MMIC's Board of Directors provided the Senior Management Search Committee with the full authority to make final decisions regarding Plaintiff's work status. In addition, the members of the Senior Management Search Committee constituted a majority of the members of MMIC's Board of Directors.

43.     On September 29, 2005, the Senior Management Search Committee concluded that it would not permit Plaintiff to return to work and voted to terminate Plaintiff's employment because of his disability. The Senior Management Search Committee ostensibly relied on Dr. Barnes' report—even though the Committee was aware that her report was incorrect and improperly obtained, and failed to consider any reasonable accommodations.

44. The Senior Management Search Committee refused to permit Plaintiff to return to work and voted to terminate Plaintiff's employment based on Plaintiff's disability and in retaliation for Plaintiff's efforts to assert his rights under the ADA and the MHRA.

45. In addition, in a misplaced effort to mitigate its liability for refusing to permit Plaintiff to return to work, for refusing to provide Plaintiff with a reasonable accommodation as required by applicable law, and for deciding to terminate Plaintiff's employment because of his disability, the Senior Management Search Committee devised an illusory "accommodation" that itself amounted to an adverse employment action. Rather than permit Plaintiff to return to work with the reasonable accommodations outlined by Dr. Attfield and Dr. Grube, the Senior Management Search Committee proposed that Plaintiff return to work as a so-called token "Special Consultant" to the new CEO and President, at less than 30 percent of Plaintiff's compensation as CEO and President, and with none of the responsibilities of CEO and President.

46. The Senior Management Search Committee also requested that Plaintiff re-negotiate his Employment Agreement with MMIC—with no consideration to Plaintiff—in order to accept the token position of Special Consultant with reduced pay.

47. Neither MMIC, the Senior Management Search Committee, nor MMIC's Board of Directors ever articulated which of the essential functions of the job of CEO and President that Plaintiff allegedly could not perform. In addition, neither MMIC, the Senior Management Search Committee, nor MMIC's Board of Directors ever articulated why it rejected and would not provide Plaintiff with the reasonable accommodations outlined by Dr. Attfield and Dr. Grube.

48. MMIC, the Senior Management Search Committee, and MMIC's Board of Directors made its determinations based on the stereotyped determination that Plaintiff, who was at the time confined to a wheelchair and had suffered a stroke, could not be the public face of their company. In other words, MMIC did not want an individual with a disability to act as its CEO and President,

with our without a reasonable accommodation, and regardless of whether the individual could perform the essential functions of the job.

49. The Senior Management Search Committee specifically informed MMIC's Board of Directors that if Plaintiff did not accept the job of "Special Consultant"—with substantially diminished responsibilities and authority at substantially less pay—it would recommend that Plaintiff's "employment be terminated on the grounds of disability."

50. Plaintiff's employment with MMIC effectively was terminated on September 29, 2005, when the Senior Management Search Committee made its determination to prohibit Plaintiff from returning to work as MMIC's CEO and President.

51. On October 11, 2005, MMIC's Board gave its token affirmation of the already determinative decision of the Senior Management Search Committee to terminate Plaintiff employment with MMIC because of his disability.

52. MMIC terminated Plaintiff's employment "without cause" as defined by the Employment Agreement and failed and refused to pay him severance and other compensation and benefits as set forth in the Employment Agreement.

53. MMIC did not terminate Plaintiff's employment for "cause" or death as defined by the Employment Agreement, and Plaintiff was not "totally disabled" under the terms of the Employment Agreement.

54. MMIC's deliberate actions and failure to act as set forth above were undertaken with malice and reckless indifference to Plaintiff's rights protected under federal and state law.

**COUNT I**
(Disability Discrimination in Violation of the ADA)

55. Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 though 54 as set forth above.

56. MMIC's actions and failure to act as set forth above constitute unlawful intentional and willful discrimination against Plaintiff on the basis of his disability in violation of the ADA.

57. As a direct and proximate cause of MMIC's conduct, Plaintiff has suffered and continues to suffer damages, humiliation, pain and suffering, and emotional distress.

### COUNT II
(Disability Discrimination in Violation of the MHRA)

58. Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 though 54 as set forth above.

59. MMIC's actions and failure to act as set forth above constitute unlawful intentional and willfful discrimination against Plaintiff on the basis of his disability in violation of the MHRA.

60. As a direct and proximate cause of MMIC's conduct, Plaintiff has suffered and continues to suffer damages, humiliation, pain and suffering, and emotional distress.

### COUNT III
(Failure to Provide Reasonable Accommodation in Violation of the ADA and the MHRA)

61. Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 though 54 as set forth above.

62. MMIC failed and refused to provide Plaintiff with a reasonable accommodation as required by the ADA and the MHRA.

63. As a direct and proximate cause of MMIC's conduct, Plaintiff has suffered and continues to suffer damages, humiliation, pain and suffering, and emotional distress.

### COUNT IV
(Unlawful Retaliation in Violation of the ADA and the MHRA)

64. Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 though 54 as set forth above.

65. Plaintiff's efforts to oppose MMIC's unlawful actions under the ADA and the MHRA and to assert his rights to MMIC under the ADA and the MHRA, including, but not limited

to, his rights to a reasonable accommodation under the ADA and the MHRA, constitute protected activity under the ADA and the MHRA.

66. MMIC's actions and failure to act as set forth above, including, but not limited to, refusing to provide Plaintiff with a reasonable accommodation, seeking to strip Plaintiff of his responsibilities and salary, and terminating Plaintiff's employment, constitute unlawful retaliation in violation of the ADA and the MHRA.

67. As a direct and proximate cause of MMIC's conduct, Plaintiff has suffered and continues to suffer damages, humiliation, pain and suffering, and emotional distress.

## COUNT V
(Breach of Contract)

68. Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 though 54 as set forth above.

69. MMIC breached Plaintiff's Employment Agreement by failing and refusing to provide Plaintiff with severance payments and other compensation and benefits as set forth in the Employment Agreement.

70. As a direct and proximate cause of MMIC's breach of contract, Plaintiff has suffered and continues to suffer damages.

## COUNT VI
(Intention Infliction of Emotional Distress)

71. Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 though 54 as set forth above.

72. MMIC, acting through its agents, representatives, and members of its Board of Directors, intentionally or recklessly inflicted severe emotional distress on Plaintiff, or was certain or substantially certain that such distress would result from its conduct.

73. The conduct of MMIC, acting through its agents, representatives, and members of its Board of Directors, was so extreme and outrageous as to exceed all possible bounds of decency and was atrocious and utterly intolerable in a civilized society.

74. The conduct of MMIC, acting through its agents, representatives, and members of its Board of Directors, caused Plaintiff to suffer emotional distress that was so severe that no reasonable person could be expected to endure it.

75. The conduct of MMIC, acting through its agents, representatives, and members of its Board of Directors, that caused Plaintiff to suffer severe emotional distress includes, but is not limited to, misrepresenting to Plaintiff that MMIC would make efforts to assist returning him to work as CEO and President of the organization he founded while making plans to terminate Plaintiff's employment and prevent him from returning to work; demanding that Plaintiff make a trip to another state for an unauthorized medical examination although MMIC was aware that it was extremely awkward for Plaintiff to engage in transportation at the time; altering Plaintiff's job description in an effort to make it appear that he could not perform his duties as CEO and President; creating a committee to search for a replacement for Plaintiff before assessing Plaintiff's ability to return to work; humiliating and embarrassing Plaintiff with unreasonable demands; misleading Plaintiff about its intentions to return Plaintiff to work as CEO and President; making false and defamatory statements about Plaintiff, including that Plaintiff was "brain damaged" and could not control his bowels; attempting to strip Plaintiff of his salary and job responsibilities; and conspiring to prevent Plaintiff from returning to work as CEO and President.

76. The severe emotional distress suffered by Plaintiff as a result of MMIC's conduct did not arise out of, or occur in the course of, Plaintiff's employment with MMIC.

77. As a direct and proximate cause of MMIC's intentional infliction of emotional distress, Plaintiff has suffered and continues to suffer damages, humiliation, pain and suffering, and emotional distress.

## COUNT VII
(Negligent Infliction of Emotional Distress)

78. Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 though 54 as set forth above.

79. MMIC owed a duty of care to Plaintiff to act reasonably and to avoid inflicting emotional harm on Plaintiff. Further, as Plaintiff's employer, MMIC had a special relationship with Plaintiff sufficient to create a duty of care owed by MMIC to Plaintiff to act reasonably and avoid inflicting emotional harm on Plaintiff.

80. By its conduct as set forth above, MMIC breached the duty of care it owed to Plaintiff.

81. As a direct and proximate cause of MMIC's conduct, Plaintiff suffered severe emotional distress.

82. The harm suffered by Plaintiff was foreseeable.

83. The severe emotional distress suffered by Plaintiff as a result of MMIC's conduct did not arise out of, or occur in the course of, Plaintiff's employment with MMIC.

84. As a direct and proximate cause of MMIC's negligent infliction of emotional distress, Plaintiff has suffered and continues to suffer damages, humiliation, pain and suffering, and emotional distress.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

1. Declare the conduct engaged in by MMIC to be in violation of Plaintiff's rights;

2. Enjoin MMIC, its agents, employees, and successors, from continuing to violate Plaintiff's rights;

3. Award back pay, reinstatement and/or front pay, interest, and benefits;

4. Award Plaintiff damages, including but not limited to, compensatory, punitive, and civil penal damages in an amount to be determined at trial;

5. Award Plaintiff attorney's fees, legal expenses, and costs; and

6. Grant Plaintiff such other and further relief as may be just and proper.

Dated: July 25, 2006

        /s/ Eric J. Uhl
Eric J. Uhl, Esq.
Melinda J. Caterine, Esq.
Moon, Moss & Shapiro, P.A.
Ten Free Street, P.O. Box 7250
Portland, ME  04112-7250
Tel:  (207) 775-6001

Attorneys for Plaintiff
Patrick A. Dowling, M.D.